Filed 4/5/16

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR


| | |
|---|---|
| JOHN DOE, | B262917 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BS148077) |
| v. | |
| UNIVERSITY OF SOUTHERN CALIFORNIA, | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of Los Angeles County, Robert H. O'Brien, Judge. Affirmed in part. Reversed and remanded in part.

Scheper Kim & Harris, David C. Scheper, Marc S. Harris and Amos A. Lowder for Plaintiff and Appellant.

Paul Hastings, J. Al Latham Jr., and Felicia A. Davis for Defendant and Appellant.

# INTRODUCTION

University of Southern California (USC) found that student "John Doe"[1] violated USC's student conduct code as a result of his participation in a group sexual encounter at a fraternity party. Another student, "Jane," alleged she had been sexually assaulted by a group of men at the party. She reported that her sexual contact with John was consensual, but certain contact with the other men was not. USC's office of Student Judicial Affairs and Community Standards (SJACS) investigated Jane's allegation and found that John violated nine sections of the student conduct code, including the section prohibiting sexual assault. John appealed to USC's Student Behavior Appeals Panel (Appeals Panel), which found that there was insufficient evidence of any sexual assault. The Appeals Panel nonetheless held that John violated two sections of the student conduct code: He "encouraged or permitted" other students to slap Jane on the buttocks during the sexual activity, which the parties agree was not consensual, in violation of Student Conduct Code section 11.44C (section 11.44C), and he endangered Jane by leaving her alone in the bedroom when the involved parties dispersed in violation of Student Conduct Code section 11.32 (section 11.32).

John petitioned for a writ of mandate in the superior court, arguing that he was not afforded a fair hearing and that there was insufficient evidence to support the Appeals Panel's finding that he violated the Student Conduct Code. The court rejected John's fair hearing challenge. It also held that there was substantial evidence to support the Appeals Panel's finding that John violated section 11.44C by encouraging and permitting the other students' behavior, but that there was not sufficient evidence to support the finding that John violated section 11.32 by endangering Jane.

John appeals on both procedural and substantive grounds. USC cross-appeals the trial court's ruling granting John's petition as to section 11.32.

_____

[1] The names of appellant and all students involved have been changed or abbreviated in this opinion, as they were in the trial court below.

2

John argues that he was denied a fair hearing. We agree. Although SJACS gave John a list of Student Conduct Code sections he allegedly violated, SJACS did not provide John with any notice of the factual basis for these charges. The SJACS investigation and report focused on alleged sexual assault and whether Jane consented to sexual contact. The Appeals Panel, on the other hand, suspended John for encouraging other students to slap Jane and for endangering Jane after all sexual contact had ended. Because John never received notice of the factual basis of the allegations and the SJACS investigation focused on Jane's consent to sexual activity, John was not afforded an adequate opportunity to defend his actions relating to the slaps or leaving the bedroom. USC therefore failed to provide John fair notice of the allegations that resulted in suspension, or an adequate hearing on those allegations.

John also argues there was insufficient evidence to support the Appeals Panel's finding that he violated section 11.44C. USC argues on cross-appeal that the Appeals Panel's finding that John violated section 11.32 should be reinstated; John argues there is insufficient evidence of this violation as well. We agree with John that the evidence does not support the Appeals Panel's findings as to either violation. There is no substantial evidence that John encouraged or permitted other students to slap Jane on the buttocks in violation of section 11.44C, because the evidence does not demonstrate that John knew they would slap Jane nor that John was in a position to prevent them from doing so. There is also no evidence to support a violation of section 11.32, because the Appeals Panel's finding that John endangered Jane by leaving the bedroom contradicts both John's and Jane's recollection of relevant events. The trial court's judgment is therefore affirmed in part and reversed in part.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. The incident

The following facts are taken from the administrative record. The basic facts are undisputed, although there are some inconsistencies in the details. Relevant factual discrepancies are discussed in the following section relating to the investigation.

3

Jane, who was a student and athlete at USC, and a group of her friends attended a fraternity party in January 2013 at a large, off-campus house in the hills near Los Angeles. Jane and her friends caught a bus from the fraternity house to the party location. John, a member of the USC football team, was on the same bus. Also attending the party were two male students from an out-of-state university, "Student 1" and "Student 2," who were friends of John's teammate.

At some point in the evening Jane began to dance, and John began dancing with her. John said that he and Student 1 were both dancing with Jane, "sandwiching" her between them. When asked about this, Jane did not remember whether it had occurred.[2] After dancing together for a few minutes, John pushed Jane onto a couch and gave her a provocative "lap dance," which John characterized as "flirtatious" and "silly," and Jane characterized as somewhat "uncomfortable" because people were watching. After the dance, John, Jane, and Student 1 went to a bedroom together. John had vaginal intercourse with Jane while Jane performed oral sex on Student 1. During the sexual activity, John and Student 1 made comments to each other about Jane's body. All parties agree that the entirety of this encounter was consensual. Jane returned to her group of friends and told them she had sex with John; she seemed happy and excited about it.

Approximately 45 minutes later, Jane and John returned to the bedroom a second time. There were multiple men in the room, and people were continually entering and exiting the room. Jane could not remember if she had vaginal intercourse with John again. She performed oral sex on John for about 15-30 seconds while lying on her stomach and elbows. As she did this, Jane was either completely undressed or her dress was pulled up over her hips. Someone behind Jane pulled her to her knees, and she felt her vagina being penetrated intermittently with penises and fingers.

---

[2] Both Jane and John consumed alcohol that night, but at no point was either of them incoherent or passed out. Jane repeatedly told investigators that her memory was "blurry," "foggy," and "patchy" as a result of her alcohol consumption. The parties' ability to consent as a result of intoxication is not at issue in this appeal.

At some point during this encounter, the other men present in the room—not including John—exceeded the scope of Jane's consent. One man began getting rough and hurting Jane by "forcefully finger[ing]" her. The men were also talking to each other about Jane. Jane recognized the voice of Student 1 saying, "How do you like that?" as she was being penetrated roughly. John was also saying "dirty things" about Jane and making "comments about my body." Jane perceived these comments as degrading and demoralizing. Student 1 slapped Jane hard on the buttocks. Someone else, possibly Student 2, slapped Jane again.

This interaction lasted for one to two minutes. Jane did not say anything to John or the other men, nor did she ask them to stop.[3] Jane told interviewers that when the men "got rough" she thought she might cry; despite trying not to, she did begin to cry. John said out loud, "Is she crying?" and "I can't believe she's crying." Jane perceived his statements as mocking or ridiculing rather than compassionate.

All physical contact ceased "immediately" or "instantly" upon John's observation that Jane was upset and crying. John pulled away from Jane and according to Jane he "jumped, like not jumped up, but sped off the bed." Once John got up, John and the other men dressed and left the room within 20 seconds. John estimated that the entire second encounter in the bedroom lasted five minutes or less. Jane's friend witnessed Jane emerge from the bedroom; Jane was crying and clearly upset.

After the students returned to campus, John approached Jane and apologized for the other men, saying "I don't know why they smacked you." Later, Jane texted to John, "Thanks for a good night. Your friends suck though." A week or two later, Jane approached John at another party and tried to dance with him or talk to him; she thought she might "still have a chance with him." John either ignored Jane or declined to dance with her.

---

[3] We recognize that Jane's lack of verbalization at the time was not an indication of Jane's consent. Given the posture of the case before us, however, this fact is relevant to what John knew about Jane's situation, when he knew it, and how he acted upon that knowledge.

5

## B.     The investigation

The incident happened in January 2013.  Jane reported it to SJACS in August 2013.[4]  She told SJACS representatives that in mid-February her athletic coach suggested that she had confidence issues, and therefore recommended that she see an athletics counselor.  When the counselor asked Jane if she had ever been sexually assaulted, "it dawned on me and I connected it."  She then reported to the counselor that she was assaulted by John and several other men at the party.  She told her parents about the incident in July of that year, and reported the incident to the school in August.

The progression of the investigation, as included in the administrative record, is set forth sequentially below.  The administrative record contains written reports detailing four interviews with Jane, two interviews with John, and interviews with several additional witnesses.[5]  The interview reports do not contain recordings or transcripts.  The interviews were conducted by USC employees who were a part of SJACS and other USC administrative bodies.  The main investigator was Donna Turner, Assistant Director of SJACS, who was present each of Jane's and John's interviews; each interview included a second USC representative as well.

Turner and La Shonda Blunt Coleman, who is identified as the Director of the Center for Women and Men, first interviewed Jane on August 30, 2013.  Jane reported that her memories of the night were foggy as a result of her intoxication.  She said her memory of the first and second encounter blurred together.  She told investigators about the lap dance, and said that her memory began to get "jumbled" starting from the first time she went into the bedroom with John and Student 1.  She said she was "more drunk" the second time they went to the bedroom.  She knew other men were in the room at the time, but she thought John would kick them out.  Jane reported that she did not consent to

---

[4] The role of SJACS is not entirely clear in the record on appeal.  It appears that SJACS receives reports of misconduct, investigates the alleged incident, determines whether discipline is warranted, and either recommends or directly imposes disciplinary action.

[5] A number of interviews with fraternity representatives and other witnesses who had no knowledge of the events concerning Jane and John are not discussed here.

sexual activity with anyone other than John the second time they were in the bedroom together.

The interview notes reflect Jane's statement that during the second encounter, "'One guy starts to forcefully finger me.' She recognized the voice as that of [John's] friend from the first incident. He was saying 'How do you like that' and making other comments in a degrading and demoralizing manner." The interview notes say that John was also "'saying stuff; dirty things about me,'" and John and the other men were "prompting and urging each other on in the activity." Jane did not verbalize anything when the other men began to touch her, but the men were hurting her. Importantly, Jane did not mention anything about being slapped in this interview.

The interview notes state, "She was being hurt and started crying." As soon as John observed out loud that Jane was crying, John and the other men stopped, quickly dressed, and left the room within 20 seconds, leaving Jane on the bed. One man who was not involved in the incident remained in the room. Jane said she crawled off the bed, found her clothes, and went into the bathroom attached to the bedroom to "pull[ ] herself together" before leaving the room.

On September 4, USC sent a letter to John stating, "A report has been received in this office that you allegedly have violated the University Student Conduct Code." It included the date of the incident, and the location as an off-campus fraternity event. The letter set out eleven different sections of the Student Conduct Code that John allegedly violated:

Section 11.32: "Conducting oneself in a manner that endangers the health or safety of oneself, other members or visitors within the university community or at university sponsored or related events."

Section 11.36A: "Causing physical harm to any person in the university community or at university-sponsored activities."

Section 11.36B: "Causing reasonable apprehension of harm to any person in the university community or at university-sponsored activities."

7

Section 11.38: "Behavior which disrupts or interferes with normal university or university-sponsored activities . . . ."

Section 11.40: "Unauthorized use, possession or dissemination of alcohol in the university community or at university-sponsored activities."

Section 11.44A: "Engaging in disruptive or disorderly conduct in the university community or at university-sponsored activities."

Section 11.44B: "Engaging in a [sic] lewd, indecent or obscene behavior in the university community or at university-sponsored activities."

Section 11.44C: "Encouraging or permitting others to engage in misconduct prohibited within the university community. Failing to confront and prevent the misconduct, notify an appropriate university official of the misconduct, or remove oneself from the situation."

Section 11.53A: "Engaging in non-consensual sexual conduct or lewd, indecent, or obscene behavior which is sexual in nature, within the university community or at university-sponsored activities."

Section 11.53B: "Non-consensual actual or attempted intercourse, sexual touching, fondling and/or groping."

Section 11.53C: "A sexual assault is classified as rape when vaginal, anal, or oral penetration takes place without the consent of the person penetrated."

The September 4 letter included no factual information about the incident that led to the alleged violations. The only hint that the accusation involved John's contact with Jane is that the letter instructed John to refrain from contacting or communicating with Jane. The letter also stated, "If you wish to inspect the report cited in this letter, you must make a written request to do so 24 hours in advance of the day you wish to review the report." It went on to say, "A summary of the procedures for this process is enclosed." No summary of procedures is included with the letter in the record on appeal.

On September 5, Blunt Coleman signed a single-page form titled "Report of Alleged Violations to the USC Student Conduct Code." It stated that the named student

8

(John) was aware of the report. It included Jane's name as the "individual affected," but contained no information about the nature of the alleged violations.

On September 6, SJACS interviewers met with "B," one of Jane's friends who attended the party. B reported that she and other friends were in the hallway of the house when she saw Jane in a bedroom with multiple men. They asked if she was okay, Jane said she was fine, and someone closed the bedroom door. The friends later witnessed Jane emerge from the bedroom upset. Jane told B that at least one person other than John had sex with her. On September 10, SJACS interviewers met with "S," another of Jane's friends who attended the party. S saw Jane go into the bedroom with John and "2-3 other guys." The interview notes state, "[Jane] told [S], 'I'm OK' and told them to go, so they left." S did not witness Jane emerge from the room, but later witnessed Jane crying on a couch in the hallway. Jane never told S what happened.

On September 16, Turner of SJACS interviewed Jane a second time. Blunt Coleman was present, and is identified as Jane's advocate. The facts Jane relayed were largely consistent with her first interview. The interview notes say that after John asked if she was crying, "[t]he men stopped immediately, they dressed and they all left." Jane reiterated that her memory of the night was "spotty" as a result of her intoxication. Jane also said the alcohol affected her judgment; had she been sober, she would not have "gone in a room with a bunch of guys." Again, Jane mentioned nothing about being slapped.

On September 17, SJACS interviewers met with John for the first time. The interview notes state that "RTR[6] explained the Student Conduct Code Review Process, confirmed student's receipt of written notice of allegations, SJACS hearing officers [sic] role as non-biased third party to review information, standard of proof used to decide cases. . . . RTR explained the rights of both parties to submit and review information I [sic] the case. . . . RTR explained that both parties have a right to inspect records with 24 hour notice. . . . RTR discussed students' right to have an advisor, access to informatiou

_____

[6] It appears from the record that this may be Raquel Torres-Retana, who signed the September 4 letter to John setting out the sections of the Student Conduct Code at issue.

9

[sic], the standard of proof to decide the case, sanctions, appeals, and discussed admonition re retaliation and harassment."

When discussing the incident, John emphasized that all of his contact with Jane was consensual. This interview contains the first mention of anyone slapping Jane on the buttocks. John told interviewers that during the second sexual encounter, Student 1 slapped Jane's buttocks hard. The slap was "[h]ard, not cool by the sound." Then Student 2, who was not initially in the room but entered after the sexual activity began, slapped Jane's buttocks hard a second time. John said, "It happened so fast I couldn't stop them." John emphasized, "By no means did I put hands on her like that or have unconsensual conduct with her." At one point in the interview John indicated that he got dressed quickly after the slaps occurred; he said at another point that he was already getting dressed when the slaps occurred. He stated, "I didn't leave her there (with the guys). She was alert. Not passed out. I made sure those two guys left" before he left the room. The notes also state, "I got dressed. I had them leave. They said, Are you kidding? [John] had them leave then he left the room." When asked if he checked on Jane afterward, John responded, "I watched her pull her dress down and walked out. I should have checked on her at the time. I didn't know she was upset about it."

The same day, interviewers met with "Y," another of Jane's friends who attended the party. Y witnessed Jane emerge from the bedroom crying. The interview notes state, "[Jane] told them that while she was in there she only thought she was going to give [John] a blow job. Then other guys came up behind her. She didn't know how many people she had sex with." Y was also with Jane when John approached her after the party and apologized for the other students' behavior.

On October 1, interviewers met with the man the parties refer to as "Witness 6," John's friend who also attended the party. Witness 6 saw John and Jane dancing together, and then noticed that John disappeared. Witness 6 reported that when John returned, he told Witness 6 that he had sex with the girl he danced with (Jane) and that she was still in the room with Student 1 and Student 2. According to Witness 6, John said that they were attempting to engage in a "threesome," but they were drunk and

10

started smacking Jane's butt so John left. Witness 6 said Jane later "started trying to dance with me like she was dancing with [John], bending over. [John] gave [Witness 6] a 'no' sign (drawing his finger across his throat). Not going to dance with her." Witness 6 walked away to join his friends. He also saw John approach Jane after the students returned to campus.

Also on October 1, interviewers met with Jane for a third time. The interview notes state that the purpose of the meeting was to determine "which of [John's] behaviors [Jane] was ok with and those which made her feel uncomfortable; which were consensual and which were not consensual." Jane confirmed that the first sexual encounter with John and Student 1 was consensual in its entirety. She said that during the second encounter she was aware other people were in the room with her and John. The notes state that "someone got rough and [Jane] thought she would cry." Then Jane mentioned for the first time that someone "slappe[d] her on the butt, hard."[7] She said that there were at least two slaps. The interview notes state, "Fair to say you don't know who slapped you? [Jane]: [Jane] affirmed that she doesn't actually know who slapped her." When the interviewer asked Jane if the men had intercourse with her or just digitally penetrated her, Jane stated, "Pretty sure it was both but the digital (penetration) set me off." (Parentheses in interview notes.) Jane confirmed that all contact "stopped instantly" when John observed that she was crying. She said again that her memory of the night was "patchy" from intoxication. She stated that she did not know if all the men left the room together because she went into the bathroom, which differed slightly from her earlier statement that after the men left, she crawled off the bed and then went to the bathroom.

On October 3, interviewers met with John a second time to "try to fill in gaps now that information has been gathered from other witnesses." In the meeting notes, there is no indication that they discussed the investigation procedure or John's rights again. The notes show that interviewers asked, "Part of what she's saying is one or more people had rough sex with her that she didn't consent to the second time. Looking into if you had

_____

[7] Due to the nature of the interview notes, it is not clear whether interviewers asked Jane about this or whether Jane offered this information.

11

any role in that by encouraging it. [John] stated that he did not (and shook his head in the negative). [¶] [Interviewer]: We are not so much interested in the first incident, but whether the second incident could be considered a gang rape. We are looking into this to see if she was or was not in a position to consent" due to her intoxication. John said that Jane did not seem excessively intoxicated.

John said Jane was the one who suggested the second encounter in the bedroom with him and Student 1. He also stated that besides the three of them, no one else was in the bedroom except for a man who was passed out on a couch. He said Student 2 entered the room while the three were engaged in sexual activity, and the two slaps occurred shortly thereafter. John did not remember any conversation between the men during the incident. John "scooted back to remove himself (after the first slap). (The second slap came quickly thereafter.)" After the second slap, John "pulled away, pulled his leg around," Jane "pulled her dress back down" and the men walked out. Within an hour they took a bus back to school, and John apologized for the other students' behavior once they had returned.

On October 4 interviewers met with "C," another friend of John's who also attended the party. Student 1 and Student 2 were his friends from high school. C said he witnessed John, Jane, and Student 1 dance together before disappearing down the hallway together. He said he saw John, Student 1, and Student 2 emerge from the bedroom together.

On October 22 interviewers met with Jane a fourth time. Blunt Coleman also attended as Jane's advocate. The interview notes state, "[Turner] asked [Jane] if she has received all the statements she sent to her. [Jane] replied that she had." The interviewers also stated that notes for the most recent interviews needed to be sent to Jane, and they showed Jane notes from other recent witnesses interviews during Jane's interview.

Jane reiterated at several points in this interview that she was "drunk" while she and John were interacting. Jane said the men's comments started when the other men began touching her; she did not know when John started making comments. Investigators asked, "Did [John] or anyone tell anyone to do something to you? Were

12

there any directive comments?" Jane replied, "I don't think so." Later investigators asked, "Did anyone tell them to hit you?" Jane replied, "No." The interview notes state, "[Turner] said I know it is hard, but can you tell me what [John] was saying?" [Jane] replied, "How do you like that?" [Turner] asked if John was saying that. [Jane] said, 'They were all saying it. Like, "Look at her! Oh my god!" When asked when John started saying these things, Jane replied that she did not know. She also said, "They would say how do you like that? whenever anything was being done—fingering me violently and hitting me." She added, "[T]hey were all kind of feeding off each other." Later in the interview when asked specifically what John said, Jane replied that he made "[c]omments about my body." Jane also said that during the first encounter John and Student 1 made "comments to each other about my body" that she did not find offensive.

Jane thought the abusive conduct with commentary lasted about a minute or two before she began crying. Within this time frame, she was slapped "[t]owards the middle and then the end. There were at least three hits," which contrasted with her earlier statement that there were at least two hits (and her first two interviews, which did not mention any slaps). She also said, "[T]hree hits. I don't know how many comments." Although she said in her third interview that she did not know who slapped her, in her fourth interview Jane said Student 1 was the first person who slapped her. An investigator asked Jane how much time passed between slaps. Jane replied that she did not know. When pressed for more information, Jane replied that perhaps ten seconds passed between slaps.

On October 24, SJACS representatives met with Y again, and on October 25, they met with B again. Neither added significant facts to her earlier accounts.

## C. Results of the SJACS investigation

SJACS completed its investigation on October 29, 2013 and generated a "Summary Administrative Review" (SJACS report). The SJACS report notes that the investigation and report were completed by Turner and the other administrators who conducted the interviews. The report concluded that John violated nine different sections of the USC Student Conduct Code—all of the sections cited in the September 4 letter,

13

except sections 11.38 (disruption of "normal university or university-sponsored activities") and 11.40 ("Unauthorized use, possession or dissemination of alcohol").

In explaining its findings, two pages of the report criticize John's recollection of the story as "contradicted not only by credible information as provided by other witnesses, including [John's] own friends who attended the party, but also by [John's] own statements when asked to provide further detail." Despite Jane's repeated characterization of her memory as patchy and spotty as a result of her intoxication, the report summarily stated that "[Jane] was found to be a credible witness on the most important contested points." The report concluded, "[O]n the second sexual encounter, [Jane] did not consent to sexual intercourse, oral sex, assault, or any form of vaginal penetration with anyone other than [John.]" It found that John "had control over the number of individuals in the room" and therefore "he was the one who allowed men, other than himself, to remain in the room, unbeknownst to [Jane]." The report went on to say, "Given [Jane's] credibility and [John's] lack of credibility (and distortions of the facts), we find more credible than not [Jane's] assertion that [John] encouraged the other men to assault and penetrate [Jane]." Despite Jane's clear affirmation that the first group sexual encounter was consensual, with respect to the second encounter, the report stated, "SJACS does not find it credible that [Jane] consented to sex with two or more men . . . ."

The report concluded, "[John] actively participated, in concert with [Student 1], [Student 2], and the other men who touched or sexually penetrated [Jane], in the sexual assault of [Jane] by allowing and encouraging the group assault. Through his actions and comments, [John] encouraged and assisted in the sexual assault that [Jane] suffered. [John] thereby violated the above listed sections of the Student Conduct Code." The SJACS report does not connect any of John's actions to specific Student Conduct Code sections.

John was suspended for more than two years, effective immediately. During that time, he would not be allowed to complete any work toward a USC degree. Once the suspension period was complete, he would be required to demonstrate his "preparedness" to re-enroll to the Associate Vice Provost of Student Affairs; otherwise he would not be

14

allowed to re-enroll.[8]  If he were to re-enroll, he would automatically be placed on "deferred expulsion," so that if he was "responsible for any further violation of the Student Conduct Code" he would be subject to immediate expulsion.  The report stated that sanctions against John were imposed "to educate [John] and further his personal development" and to "protect the University community."

John was informed of the SJACS decision in a long letter that reiterated SJCAS's findings.  The letter stated, "[John] actively participated, in concert with [Student 1], [Student 2] and the other men who touched or sexually penetrated [Jane], in the sexual assault of [Jane] by allowing and encouraging the assault.  Through his actions and comments, [John] encouraged and assisted in the sexual assault that [Jane] suffered."  The letter imposed the same penalties as the SJACS report, with an added requirement that John "must provide proof of counseling regarding the issues raised by the January 26, 2013 incident including alcohol use/abuse.  Verification of counseling from a licensed therapist or counselor" was required to be submitted to the school prior to re-enrollment.  The letter provided John with information about how to appeal the decision.

### D.     John's appeal

John retained counsel and appealed to USC's Student Behavior Appeals Panel.  He pointed out in his appeal letter that despite minor discrepancies in the various accounts of the evening, the major facts were not in dispute:  Jane engaged in consensual sexual activity with John and Student 1 at least once; Jane and John engaged in consensual sexual activity twice; Student 1 and Student 2 exceeded the scope of Jane's consent by slapping her; and John terminated the second sexual encounter immediately upon discovering that Jane was upset.  The letter highlighted numerous inconsistencies in the evidence, argued that there was bias in the investigation (such as providing Jane, but not John, with all witness statements, and meeting with Jane, but not John, multiple times to "clarify" inconsistencies), and objected that SJACS credited Jane's version of events, even when contradicted by multiple other witnesses.  John also argued that the

---

[8] There is no indication in the record of what a demonstration of preparedness would entail.

investigative process was unfair because there was no evidentiary hearing, and the onus was put on John to prove his innocence rather than the other way around.

No response to John's appeal letter from SJACS or any other USC administrative body appears in the record. Jane submitted a letter detailing the difficulties she had experienced after the incident, which she characterized as a rape. She also stated that she is uncomfortable on campus knowing that John was still there, and concluded, "I do not believe that the University is enforcing its Title IX responsibilities for responding effectively and immediately to reports of sexual harassment, or quelling what is currently a hostile environment. I expect that the University will hold [sic] its original decision for my case in order to ensure my safety, comfort, and peace on this campus."

The Appeals Panel issued its decision in March 2014. The Appeals Panel opined that the procedural process was fair and that an evidentiary hearing was not required. The written decision stated, "[T]he questions presented for this panel's review are whether the investigator failed to follow university rules while reviewing the cited behavior and whether the sanction imposed is excessive or inappropriate. Our decision is subject to review and approval by the Vice Provost, Student Affairs, and once approved is a final decision without further appeal." Because John argued in his appeal letter that the investigation was biased, the Appeals Panel "examined particularly carefully whether the evidence supports each finding and whether the findings support the conclusion as to each of the specific violations cited."

The Appeals Panel disagreed with SJACS on several important points. The Appeals Panel held that the second sexual encounter could not support a finding that John encouraged or participated in a sexual assault. The panel noted that John, Jane, and Student 1 engaged in consensual group sex once, and that the second interaction "involved sexual behavior with the same two people in the same place only 45 minutes apart. Thus it was reasonable for the accused to believe that the complainant's consent for sexual activity with [Student 1] was ongoing from the first encounter until the complainant signaled otherwise by word or deed." The Appeals Panel found, however, that there was no "reasonable basis for the accused to believe the complainant consented

16

to being struck by anyone." The Appeals Panel therefore found that Student 1 and Student 2 improperly slapped Jane, John encouraged or permitted the slaps, and John endangered Jane by leaving the bedroom while Jane was still in the bedroom with Student 1 and Student 2.

The Appeals Panel overturned the SJACS decision with respect to seven of the nine Student Conduct Code sections John was accused of violating, but held that John violated two sections of the Student Conduct Code. First, the Appeals Panel held that John violated Student Conduct Code section 11.44C, which prohibits, in part, "[e]ncouraging or permitting others to engage in misconduct prohibited within the university community." Quoting Jane's statements from both her first and third interviews, the Appeals Panel held that John violated section 11.44C because when Student 1 and Student 2 slapped Jane, "at each blow one of the men including the accused made taunting and aggressive comments about what she was experiencing." As a result, the Appeals Panel concluded, "[T]he accused permitted the assault." The Appeals Panel also held that John failed to comply with the second phrase of section 11.44C, "[F]ailing to confront and prevent the misconduct, notify an appropriate university official of the misconduct, or remove [one]self from the situation."

Second, the Appeals Panel found that John violated Student Conduct Code section 11.32, which prohibits "[c]onducting oneself in a manner that endangers the health or safety of other members. . .within the university community." The Appeals Panel credited Witness 6's statement, holding that SJACS "reasonably read the evidence as showing it was more likely than not that the accused exited the room before [Student 1 and Student 2], leaving the complainant in the room with the two men." As a result, "the accused abandoned the complainant by leaving the room before the two men who had accosted her, and thus endangered her safety."

The Appeals Panel reduced John's suspension from two years to one year. It upheld the remaining restrictions and conditions.

17

### E. Writ proceedings in the trial court

John challenged the Appeals Panel's decision in a petition for writ of mandate under Code of Civil Procedure, section 1094.5 filed in the superior court.[9] He applied ex parte for a stay of the Appeals Panel's decision. The trial court denied the initial request and a renewed request days later, stating that there was an insufficient factual showing of irreparable harm.

In his writ petition, John argued that the investigation and hearing process were unfair in that he was deprived of an adversarial proceeding in which he could challenge the evidence presented against him. He also argued that he was not provided with adequate notice, because the Appeals Panel's rationale for the violations of the Student Conduct Code was based on an entirely different theory than the one pursued by SJACS. John also argued that the Appeals Panel's decision that he violated two sections of the Student Conduct Code was not supported by substantial evidence. USC opposed the petition, arguing that the procedure was fair, and that substantial evidence supported the Appeals Panel's decision.

The trial court held that USC's procedure was fair because John had the opportunity to tell his side of the story in his two interviews, and he had the right to request any materials collected in the investigation. The court also held that John's "argument that he was denied fair notice of the issues being considered at the hearing is a non-starter. While he claims that he was not informed of the charges against him until the Appeal Panel rendered its decision, the record clearly shows that he was informed of all the charges against him from the outset. SJACS sent Petitioner a letter on September 4, 2013, that quoted each of the alleged violations, including the two he was eventually found guilty of, and stated the investigation was in connection with Jane Doe." In

---

[9] "The remedy of administrative mandamus . . . applies to private organizations that provide for a formal evidentiary hearing." (*Gupta v. Stanford University* (2004) 124 Cal.App.4th 407, 411; see also *Pomona College v. Superior Court* (1996) 45 Cal.App.4th 1716, 1722-1723.)

addition, "The Appeals Board [sic] decision did apply the code provisions to the facts in a systematic and thorough manner."

The trial court also held that substantial evidence supported the Appeals Panel's determination that John violated section 11.44C. Noting that John and other men were "encouraging each other," the court said, "[O]nly when Jane started crying did Petitioner make a ridiculing (or incredulous) comment 'is she crying?', and stop the encounter." The court went on to say, "The argument that everything was consensual does not automatically provide immunity. . . . [¶] Petitioner allowed Jane Doe to be sexually abused in the primal sense. She chose to be with him albeit in a drunken state. That he invited another so called drunken man to also engage in sex with her in a drunken state is a phenomenon that the word 'consensual' does not apply to in a civilized society. [¶] Given her condition, what would a civilized, rational person do? [¶] He would protect her." The court concluded, "The Appeals Board [sic] was justified in finding that Petitioner violated this section by not taking some affirmative step to prevent the misconduct that his acquaintances were committing right in front of him."

However, the trial court held that substantial evidence did not support the Appeals Panel's decision that John violated section 11.32. The court noted that both Jane and John stated that the men left together, and held that the Appeals Panel erred by relying on the less-reliable testimony of Witness 6. The court therefore granted John's petition with respect to the violation of section 11.32, and denied the remainder of the petition.

John timely appealed and USC cross-appealed.

## STANDARD OF REVIEW

The scope of our review from a judgment on a petition for writ of mandate is the same as that of the trial court. (*California Department of Corrections and Rehabilitation v. California State Personnel Board* (2015) 238 Cal.App.4th 710, 716.) "An appellate court in a case not involving a fundamental vested right reviews the agency's decision, rather than the trial court's decision, applying the same standard of review applicable in the trial court." (*Schafer v. City of Los Angeles* (2015) 237 Cal.App.4th 1250, 1261.)

19

With respect to a petition for writ of mandate, we determine "whether the respondent has proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion." (Code Civ. Proc., § 1094.5, subd. (b).) "Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (*Ibid.*)

We review the fairness of the administrative proceeding de novo. "A challenge to the procedural fairness of the administrative hearing is reviewed de novo on appeal because the ultimate determination of procedural fairness amounts to a question of law." (*Nasha L.L.C. v. City of Los Angeles* (2004) 125 Cal.App.4th 470, 482.) "The statute's requirement of a 'fair trial' means that there must have been 'a fair administrative hearing.'" (*Gonzalez v. Santa Clara County Department of Social Services* (2014) 223 Cal.App.4th 72, 96; *Pomona College v. Superior Court*, *supra*, 45 Cal.App.4th at p. 1730.) Where student discipline is at issue, the university must comply with its own policies and procedures. (*Berman v. Regents of University of California* (2014) 229 Cal.App.4th 1265, 1271.)

We review the Appeals Panel's substantive decision for substantial evidence. (Code Civ. Proc., § 1094.5, subd. (c) ["abuse of discretion is established if the court determines that the findings are not supported by substantial evidence in the light of the whole record."].)

**DISCUSSION**

A.     **Fair hearing**

John argues that he was not provided sufficient notice of the charges that were ultimately imposed, because the Appeals Panel relied on an entirely different theory to justify sanctions against John compared to that relied upon by SJACS. He also argues that he was not afforded a fair hearing at any stage of the proceedings, because he did not have "an opportunity to test and rebut the evidence against him." John also contends he should have been allowed to cross-examine witnesses or otherwise test the credibility, knowledge, and recollection of the witnesses against him.

20

Section 17.03 of the Student Guidebook states that one of the "procedural protections" granted to accused students is "[w]ritten notice of the incident report that specifies the nature of the alleged violation and the basis for the charge including the date and period of time and location of the alleged incident." USC provided John notice of the code sections he allegedly violated, but it did not provide any information at any stage about what activity ultimately would form the basis for those violations and related penalties. There was also no hearing, as that term is commonly understood. Instead, SJACS did its investigation by interviewing witnesses and writing its report recommending penalties, which John appealed to the Appeals Board.

Generally, a fair procedure requires "notice reasonably calculated to apprise interested parties of the pendency of the action . . . and an opportunity to present their objections." (*Bergeron v. Department of Health Services* (1999) 71 Cal.App.4th 17, 24; see also *Rosenblit v. Superior Court* (1991) 231 Cal.App.3d 1434, 1445 ["Notice of the charges sufficient to provide a reasonable opportunity to respond is basic to the constitutional right to due process and the common law right to a fair procedure."].) With respect to student discipline, "[t]he student's interest is to avoid unfair or mistaken exclusion from the educational process, with all of its unfortunate consequences. . . . Disciplinarians, although proceeding in utmost good faith, frequently act on the reports and advice of others; and the controlling facts and the nature of the conduct under challenge are often disputed. The risk of error is not at all trivial, and it should be guarded against if that may be done without prohibitive cost or interference with the educational process." (*Goss v. Lopez* (1975) 419 U.S. 565, 579-580 (*Goss*).)

"At the very minimum, therefore, students facing suspension . . . must be given some kind of notice and afforded some kind of hearing." (*Goss, supra*, 419 U.S. at p. 579.) The hearing need not be formal, but "in being given an opportunity to explain his version of the facts at this discussion, the student [must] first be told what he is accused of doing and what the basis of the accusation is." (*Id*. at p. 582.)

Here, both the notice and the hearing were insufficient.

1.	*Notice*

In the initial letter from SJACS, John was not apprised of the factual basis of the accusations against him; he was given only a list of code sections, a date, and Jane's name.  After its investigation, SJACS found that sanctions were warranted because John participated in a group sexual assault.  The Appeals Panel, on the other hand, found that sanctions for sexual assault could not be supported on the record.  Instead, the Appeals Panel found that John violated section 11.44C because John encouraged or permitted the other students to slap Jane.  John was never provided notice or an opportunity to respond to the theory that his actions in relationship to the other students' slaps, separated from the remaining activity, could result in his suspension.  The Appeals Panel also found that John violated section 11.32 because he endangered Jane when he left the bedroom.  The factual basis for this finding is troubling, because the SJACS report does not even suggest that Jane was in danger when John left the room, or that John endangered Jane by his actions after the group activity ceased.  Because John had no notice that such allegations were at issue, he had no opportunity to defend himself.

Moreover, in the only times when John did have an opportunity to explain his actions—during the SJACS interviews—the SJACS investigators led John to believe that the only issue was whether sexual contact with Jane was consensual.  They did not inform him that they were investigating whether John encouraged the other students' slaps or if Jane was in danger after John left the room.  The notes for John's second interview state, "[Interviewer]:  Part of what she's saying is one or more people had rough sex with her that she didn't consent to the second time.  Looking into if you had any role in that by encouraging it.  [John] stated that he did not (and shook his head in the negative).  [¶]  [Interviewer]:  We are not so much interested in the first incident, but whether the second incident could be considered a gang rape.  We are looking into this to see if she was or was not in a position to consent" due to her intoxication.  John also stated at this interview, "The only thing I'm upset about . . . the only thing I did with her was completely consensual.  I feel I was completely respectful.  I was so shocked that my name came up."  The investigator's statements, John's comments, and John's emphasis

on Jane's consent through both interviews indicate that the investigation focused on whether John's and Student 1's sexual contact with Jane was consensual. There is no indication from either John or the investigators in any of the interviews that John was informed that he could be penalized based on other students slapping Jane, or because of the manner in which John left the bedroom afterward.

In support of his argument that notice was lacking, John cites *In re Ruffalo* (1968) 390 U.S. 544, in which an Ohio attorney challenged a decision disbarring him for misconduct. The Ohio Board of Commissioners on Grievances and Discipline originally charged the attorney with twelve counts of misconduct. After the attorney and a witness testified at a hearing about the alleged misconduct, the board added another charge based on the attorney's testimony; the additional charge eventually served as the basis for the attorney's disbarment. The Supreme Court held that the process deprived the attorney of due process: "These are adversary proceedings of a quasi-criminal nature. [Citation.] The charge must be known before the proceedings commence. They become a trap when, after they are underway, the charges are amended on the basis of testimony of the accused. He can then be given no opportunity to expunge the earlier statements and start afresh. [¶] . . . [¶] This absence of fair notice as to the reach of the grievance procedure and the precise nature of the charges deprived petitioner of procedural due process." (*In re Ruffalo*, 390 U.S. at pp. 551-552.)

USC is correct that *In re Ruffalo* is distinguishable because the attorney there did not have notice of the additional charge or its basis at the outset of the case, and here John knew which Student Conduct Code sections were at issue. However, the comparison to *In re Ruffalo* is apt in that a disciplinary penalty based on testimony given while defending against a different charge smacks of unfairness. The comparison is especially compelling here in that Jane never mentioned the slaps in her first two interviews. Therefore, the slaps clearly did not serve as the basis for Jane's complaint to SJACS, nor could they have been the basis of the SJACS letter accusing John of violating the Student Conduct Code—yet the slaps ultimately provided the basis for John's suspension. In addition, the Appeals Panel used statements from Jane's first interview—

23

before anyone ever mentioned slaps—to support their finding that John encouraged the slaps.

Moreover, the attorney in *In re Ruffalo* was afforded a continuance to address the new allegation, and the Supreme Court found the process to be unfair nonetheless. Here, John was not afforded any opportunity to address the Appeals Panel's new theory. No further investigation was done once the Appeals Panel rendered its decision, John was not provided any opportunity to be heard on the specific allegations that he permitted the slaps or that he endangered Jane by leaving the bedroom, and the order suspending him from school was effective immediately. This process does not pass muster under *In re Ruffalo*.

John also cites *Wheeler v. State Bd. of Forestry* (1983) 144 Cal.App.3d 522 (*Wheeler*), where a professional forester's license was revoked after the State Board of Forestry found him guilty of "gross incompetence" under Public Resources Code section 778, subdivision (b). The forester was not initially charged with gross incompetence, however; "rather, the error was charged as a 'deceit, misrepresentation, or fraud in his practice,' separate grounds of discipline under Public Resources Code section 778, subdivision (b), and on these charges Wheeler was exonerated." (*Id*. at p. 526.) The court, applying Administrative Procedure Act (APA)[10] guidelines, held that the uncharged allegation could not be sustained: "An accusation is required to initiate the proceeding and must specify 'the statutes and rules which the respondent is alleged to have violated . . . .' (Gov. Code, § 11503.) The fulfillment of this requirement is a statutory predicate for disciplinary action. It follows that the finding must be based upon the accusation. Here it was not. Disciplinary action cannot be founded upon a charge not made." (*Wheeler*, *supra*, 144 Cal.App.3d at p. 527.) The court also held that the standardless term "gross incompetence" could not support the revocation of the forester's license: "[T]he APA requires, as a predicate to disciplinary action, that the accusation specify 'the statutes and rules which the respondent is alleged to have violated.' (Gov.

---

[10] Gov. Code, § 11501; Pub. Resources Code, § 776.

24

Code, § 11503.) This provides a constitutionally required notice to the accused of the standards by which his conduct is to be measured. [Citations.] It permits discipline to be imposed only for violation of an ascertainable standard of conduct." (*Wheeler*, *supra*, 144 Cal.App.3d at p. 527.)

*Wheeler* also indicates that the procedures here were insufficient. Although John was provided notice of the Student Conduct Code sections he allegedly violated, USC began its investigation by pursuing one theory of discipline (sexual assault), but imposed discipline based on a wholly different theory (encouraging or permitting battery and endangering a student by abandonment). USC argues that unlike the "gross incompetence" in *Wheeler*, "encouraging or permitting others to engage in misconduct" is not standardless. In the context of the case before us, we disagree. That SJACS and the Appeals Panel could interpret the term to censure multiple facets of John's conduct shows that the standards were extremely malleable. We recognize that universities need adequate tools to address the very serious and sensitive problem of sexual assault on campus. But it is not too heavy a burden to require that students facing disciplinary action be informed of the factual basis for the charges against them. A charge of "encouraging or permitting others to engage in misconduct" that can penalize completely different behavior based on the decision-maker (SJACS versus the Appeals Panel), without notice to the student, is indeed as standardless as the undefined "gross incompetence" in *Wheeler*.

Because John was not informed of the factual basis of the allegations at the outset, SJACS told John that they were investigating his involvement in a sexual assault, and the sanction John appealed was based primarily on a finding of sexual assault, John was never afforded notice or a meaningful opportunity to address whether he "encouraged or permitted" the slaps, or whether his departure from the bedroom endangered Jane. If notice is to be meaningful, it must include information about the basis of the accusation—not just a list of Student Conduct Code sections that can be interpreted to encompass any activity SJACS or the Appeals Panel finds to be inappropriate. Because John was sanctioned based on activities that he was never informed might be the cause

25

for sanctions, John was not provided with sufficient notice required of a fair hearing under Code of Civil Procedure, section 1094.5, subdivision (b).

2.    *Lack of a hearing*

The lack of a hearing that would have allowed John to respond to the evidence presented against him compounded the problems arising from the lack of sufficient notice. The notes from Jane's fourth interview make clear that Jane had been provided copies of SJACS's notes relating to every witness, including those who had very little relevant knowledge. John, on the other hand, did not receive any information regarding the other witnesses' testimony. USC argues that John did not have that information because he "did not avail himself of the right to inspect records until after he filed his administrative appeal." In addition, USC argues that the SJACS investigation, decision, and Appeals Panel process constituted a sufficiently fair hearing: "The accused also has the right to know the charges against him, to see the evidence against him, upon request, and to respond fully to the charges, both orally and in writing. The accused also has the right to appeal the initial findings to a three-member panel. This is a hearing."

Under the circumstances of this case, we disagree that this hearing meets the fair hearing requirements of Code of Civil Procedure, section 1094.5, subdivision (b). As noted above, John was not informed about the factual basis for the charges for which he was ultimately sanctioned. He therefore never had a sufficient hearing affording him the opportunity to respond fully to those charges.

We recognize that "the pure adversary model is not entitled to constitutionally enshrined exclusivity as the means for resolving disputes in '[t]he incredible variety of administrative mechanisms [utilized] in this country. . . .'" (*Howitt v. Superior Court* (1992) 3 Cal.App.4th 1575, 1581, quoting *Withrow v. Larkin* (1975) 421 U.S. 35, 52.) Rather, "[s]pecific requirements for procedural due process vary depending upon the situation under consideration and the interests involved." (*Applebaum v. Board of Directors* (1980) 104 Cal.App.3d 648, 657.)

For example, "[a]lthough we recognize the value of cross-examination as a means of uncovering the truth [citation], we reject the notion that as a matter of law every

administrative appeal . . . must afford the [accused] an opportunity to confront and cross-examine witnesses." (*James v. City of Coronado* (2003) 106 Cal.App.4th 905, 912 [discussing disciplinary actions involving police officers under Gov. Code § 3304, subd. (b)].) In administrative cases addressing sexual assault involving students who live, work, and study on a shared college campus, cross-examination is especially fraught with potential drawbacks. The United States Department of Education Office for Civil Rights (OCR) addressed this issue in its April 4, 2011 "Dear Colleague" letter, intended as a guidance document regarding sexual violence on college campuses.[11] It stated, "OCR strongly discourages schools from allowing the parties personally to question or cross-examine each other during the hearing. Allowing an alleged perpetrator to question an alleged victim directly may be traumatic or intimidating, thereby possibly escalating or perpetuating a hostile environment."[12] (OCR Dear Colleague letter, p. 12.)

There are few cases defining fair hearing standards for student discipline at private universities.[13] Cases involving procedural due process requirements under similar circumstances, however, may be instructive. (See *BreakZone Billiards v. City of*

------

[11] http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf.

[12] We note that there are alternate ways of providing accused students with the opportunity to hear the evidence being presented against them without subjecting alleged victims to direct cross-examination by the accused. (See, e.g., *Doe v. University of the Pacific* (E.D. Cal., Dec. 8, 2010, CIV. S-09-764) 2010 WL 5135360, at *4 [the accusing student's "testimony was not presented live to Respondent Students but instead was tape recorded and played for Respondent Students immediately following the completion of her testimony"]; *Gomes v. University of Maine System* (D. Me. 2005) 365 F.Supp.2d 6, 27 [placing a screen between the accuser and the accused]; Columbia University, Gender-Based Misconduct Policies for Students, August 2013, p. 15, available at http://ssgbsm.columbia.edu/files/gbsm/content/Gender-Based_Misconduct_Policies_Students.pdf [providing that witnesses will provide testimony directly to the hearing panel while other parties view live testimony from a separate room via closed-circuit television].)

[13] The hearing standards required for student discipline are not necessarily the same as those required for academic purposes. "[T]here are distinct differences between decisions to suspend or dismiss a student for disciplinary purposes and similar actions taken for academic reasons which may call for hearings in connection with the former but not the latter." (*Board of Curators of University of Missouri v. Horowitz* (1978) 435 U.S. 78, 87.)

27

*Torrance* (2000) 81 Cal.App.4th 1205, 1236, fn. 24.) As noted above, for example, *Goss* held that in student disciplinary proceedings, due process requires "an 'informal give-and-take' between the student and the administrative body dismissing him that would, at least, give the student 'the opportunity to characterize his conduct and put it in what he deems the proper context.'" (*Horowitz*, *supra*, 435 U.S. at p. 86, quoting *Goss*, 419 U.S. at p. 584.)

The parties reply in part on *Dixon v. Alabama State Bd. of Ed.* (5th Cir. 1961) 294 F.2d 150, 159 (*Dixon*), which held that when a student is facing disciplinary sanctions, "the student should be given the names of the witnesses against him and an oral or written report on the facts to which each witness testifies. He should also be given the opportunity to present to the Board [of Education], or at least to an administrative official of the college, his own defense against the charges and to produce either oral testimony or written affidavits of witnesses in his behalf. If the hearing is not before the Board directly, the results and findings of the hearing should be presented in a report open to the student's inspection. If these rudimentary elements of fair play are followed in a case of misconduct of this particular type, we feel that the requirements of due process of law will have been fulfilled." (See also *Andersen v. Regents of University of California* (1972) 22 Cal.App.3d 763, 771 (*Anderson*) ["As said in *Dixon*, supra, the student is entitled to (1) a notice containing a statement of the specific charges against him, the names of the witnesses and a statement of the gist of their proposed testimony, and (2) a hearing the scope and nature of which should vary according to the circumstances of the particular case. The hearing need not be a full dress judicial hearing but one giving the student a full opportunity to present his defenses."]; *Goldberg v. Regents of University of Cal.* (1967) 248 Cal.App.2d 867, 882 (*Goldberg*) [due process requirements were met where the student plaintiffs "received a proper advance notice of the hearing specifying the particular charges and suggesting that they might wish to obtain counsel," and "[p]laintiffs were represented by counsel and given ample opportunity to hear and observe the witnesses against them and to present their own defense."].)

USC argues the procedural protections required in *Dixon* were in place here because John had access to information submitted by the other witnesses and an opportunity to respond to that evidence—had he requested it. But requiring John to request access to the evidence against him does not comply with the requirements of a fair hearing. (See, e.g., *Goss*, *supra*, 419 U.S. at p. 582 ["in being given an opportunity to explain his version of the facts . . . the student [must] first be told what he is accused of doing and what the basis of the accusation is"]; *Dixon*, *supra*, 294 F.2d at p. 159 ["the student should be given the names of the witnesses against him and an oral or written report on the facts to which each witness testifies"]; *Andersen*, *supra*, 22 Cal.App.3d at p. 771 ["the student is entitled to . . . the names of the witnesses and a statement of the gist of their proposed testimony"]; *Goldberg*, *supra*, 248 Cal.App.2d at p. 882 [students should be "given ample opportunity to hear and observe the witnesses against them "].)

Even where constitutional due process protections do not apply, common law requirements for a fair hearing under section 1094.5 do not allow an administrative board to rely on evidence that has never been revealed to the accused. For example, in *Pinsker v. Pacific Coast Society of Orthodontists* (1974) 12 Cal.3d 541 (*Pinsker*), an orthodontist, Pinsker, was rejected from a professional association. He argued that the association's process for denying his membership did not afford him a fair hearing. The association argued, as USC does here, that they provided Pinsker a fair hearing by "conducting an investigation into Pinsker's case and by resting their rejection of this application on the information disclosed by that investigation." (*Id*. at p. 555.) The Supreme Court rejected this argument: "Although the trial court apparently agreed with this contention, we conclude that the procedure followed in the instant case does not meet minimal common law standards." (*Ibid*.) The Court said that although "[t]he common law requirement of a fair procedure does not compel formal proceedings with all the embellishments of a court trial," private associations "retain the initial and primary responsibility for devising a method which provides an applicant adequate notice of the 'charges' against him and reasonable opportunity to respond. In drafting such procedure, and determining, for example, whether an applicant is to be given an opportunity to respond in writing or by

29

personal appearance, the organization should consider the nature of the tendered issue and should fashion its procedure to insure a fair opportunity for an applicant to present his position." (*Id.* at pp. 555-556.) Pinsker, like John, was unaware that certain issues would be considered by the association, and therefore never had the opportunity to respond to those issues. The Court held, "Under these circumstances, we conclude that the procedure followed by the defendant association did not meet the minimum standards required under the common law." (*Id.* at p. 556.)

A similar procedure was also rejected by the Supreme Court in *English v. City of Long Beach* (1950) 35 Cal.2d 155. There, the civil service board was considering whether a police officer's physical limitations interfered with his ability to perform his duties. Before the required employment hearing, "[m]embers of the board took evidence outside the hearing and outside the presence of [the officer] or his attorney. Some of them talked to one of the examining doctors, and one member questioned his personal physician concerning the relation of [the officer's] asserted disability to the performance of the duties of his position." (*Id.* at p. 157.) The officer was afforded a hearing, but the board members relied in part on the evidence they had gathered before the hearing in determining that the officer's employment should be terminated. On appeal, the Supreme Court held that the officer was denied a fair hearing. "The action of such an administrative board exercising adjudicatory functions when based upon information of which the parties were not apprised and which they had no opportunity to controvert amounts to a denial of a hearing. [Citations.] Administrative tribunals which are required to make a determination after a hearing cannot act upon their own information, and nothing can be considered as evidence that was not introduced at a hearing of which the parties had notice or at which they were present. [Citations.] . . . [T]he right of a hearing before an administrative tribunal would be meaningless if the tribunal were permitted to base its determination upon information received without the knowledge of the parties. A hearing requires that the party be apprised of the evidence against him so that he may have an opportunity to refute, test, and explain it, and the requirement of a

30

hearing necessarily contemplates a decision in light of the evidence there introduced. [Citations.]" (*Id*. at pp. 158-159.)

Here, SJACS relied on information never revealed to John, and the Appeals Panel suspended John on a different theory than SJACS. John was not provided any information about the factual basis of the charges against him, he was not allowed to access any evidence used to support those accusations unless he actively sought it through a written request, and he was not provided with any opportunity to appear directly before the decision-making panel to rebut the evidence presented against him. While a full trial-like proceeding with the right of cross-examination is not necessary for administrative proceedings, we cannot agree with USC that the process afforded to John met the standards of a fair hearing under section 1094.5.[14]

## B. Substantial evidence

John argues that even if we find that the hearing was fair, the decision of the Appeals Panel should nonetheless be overturned because any finding that John violated section 11.44C was not supported by substantial evidence. USC argues in its cross-appeal that the Appeals Panel's finding that John violated section 11.32 is supported by substantial evidence, and therefore that finding should be reinstated.

When reviewing a university's disciplinary actions, "'[t]he power of an appellate court begins and ends with the determination as to whether there is any substantial evidence, contradicted or uncontradicted, that will support the finding.' [Citation.]" (*Perlman v. Shasta Joint Jr. College Dist. Bd. of Trustees* (1970) 9 Cal.App.3d 873, 882.) "While it is commonly stated that our 'power' begins and ends with a determination that there is substantial evidence [citation], this does not mean we must blindly seize any

---

[14] The SJACS report states that it was prepared by Turner and other interviewers, "with oversight by Jody Shipper, Title IX Coordinator." Shipper also participated in one interview with Jane and one interview with John. OCR's Dear Colleague letter cautions that "serving as the Title IX coordinator and a disciplinary hearing board member . . . may create a conflict of interest." (OCR Dear Colleague letter, p. 7.) Because the exact composition of SJACS is never explained in the record before us, it is unclear whether such a conflict occurred here.

31

evidence in support of the respondent in order to affirm the judgment. . . . '[I]f the word "substantial" [is to mean] anything at all, it clearly implies that such evidence must be of ponderable legal significance. Obviously the word cannot be deemed synonymous with 'any' evidence. It must be reasonable . . . , credible, and of solid value. . . .' [Citation.] The ultimate determination is whether a *reasonable* trier of fact could have found for the respondent based on the *whole* record. [Citation.]" (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1633 [emphasis in original].)

        1.     *Section 11.44C*

Section 11.44C prohibits "[e]ncouraging or permitting others to engage in misconduct prohibited within the university community. Failing to confront and prevent the misconduct, notify an appropriate university official of the misconduct, or remove oneself from the situation." John argues that there is insufficient evidence to support the Appeals Panel's conclusion that John "encouraged" or "permitted" Student 1 or Student 2 to slap Jane.

The Appeals Panel adopted a conclusion from the SJACS report stating that "each time a blow was delivered, one of the men, including [John], made taunting and aggressive comments about what she was experiencing." USC quotes this statement no fewer than six times in its briefs in support of the argument that the Appeals Panel's decision was supported by substantial evidence. We find this characterization of events to be unsupported by the record.

First, there are only two accounts of what occurred in the bedroom: John's and Jane's. John stated that two slaps occurred in quick succession, and all contact with Jane ceased very quickly thereafter. Jane's first two interviews do not include any discussion of slaps, and therefore cannot support the Appeals Panel's finding that John permitted or encouraged the slaps.

Second, Jane's accounts were extremely vague about what John actually said. When asked specifically what John said, Jane replied that he made "[c]omments about my body." Interviewers asked Jane again what John said, and Jane replied, "How do you like that?" But this is the comment Jane attributed to Student 1—not John—in her first

32

interview, before any slaps were mentioned. When asked for clarification about whether John said that (as opposed to the other men), Jane was vague: "They were all saying it. Like, Look at her! Oh my god!" Jane did not know when John started saying these things. This does not support a finding that John permitted or encouraged the other men to slap Jane.

Third, Jane was very clear that John did not tell the other men to do anything. When asked, "Did [John] or anyone tell anyone to do something to you? Were there any directive comments?" Jane replied, "I don't think so." And later in the same interview: "Did anyone tell them to hit you? [Jane] replied No."

The Appeals Panel held that while "there is no evidence that the accused directed the activity, SJACS was reasonable in concluding that he encouraged it." The Appeals Panel partially relied on Jane's statement that the men were "prompting and urging each other on in the activity." But Jane said that in her first interview when discussing the rough digital penetration, before she ever mentioned that she was slapped. That comment therefore cannot support a finding that John encouraged or permitted the others to slap Jane. The Appeals Panel also credited Jane's statement that the men were "all kind of feeding off each other," but that statement also did not implicate anything that John may have said relating to Student 1 and Student 2 slapping Jane. In short, we find no support for the assertion that John made taunting and aggressive comments in relationship to the slaps. No substantial evidence supports a conclusion that John "encouraged . . . others to engage in misconduct."

As to whether John "permitted" the misconduct, the Appeals Panel held that John said he saw Student 1 and Student 2 "smack the complainant several times." Without citing any evidence or support, the Appeals Panel concluded that if John tried to stop the nonconsensual conduct, "it is more than likely than not that he did so, if at all, only after the complainant began crying." John told interviewers that the slaps occurred "so fast I couldn't stop them." Jane said there may have been as much as 20 seconds between the first and third slaps. The question therefore is whether there is substantial evidence to

determine that John "permitted" the other students to slap Jane within the time frame between the first and last slap.

In the six interviews discussing what occurred in the bedroom (two interviews with John and four interviews with Jane), none of the information demonstrates that John, by his words or actions, permitted Student 1 and Student 2 to slap Jane. To conclude that John could have or should have done something to control the other men's behavior necessarily requires an assumption that John knew that Student 1 would slap Jane, and then that Student 2 would follow up with another slap (or, in the case of Jane's fourth interview, that he was aware a third slap would occur). There is nothing in the record to support such a finding. John could not prevent activity he did not know was about to occur, and therefore the evidence demonstrating John's 20 ~~to 30~~ seconds of inaction, without more, cannot be fairly characterized as "permitting" Student 1's and Student 2's misconduct.

USC argues that even if we do not find that John violated the first sentence of section 11.44C by "[e]ncouraging or permitting others to engage in misconduct prohibited within the university community," we should find that John nonetheless violated the second sentence of section 11.44C because he "[f]ail[ed] to confront and prevent the misconduct, notify an appropriate university official of the misconduct, or remove [himself] from the situation." USC acknowledges that the "or" in this sentence is disjunctive, so a student may choose any one of the three actions to comply with the code section.

The evidence unquestionably shows that John complied with the third option—he removed himself from the situation. The nonconsensual activity lasted, at most, 20 seconds (assuming 10 seconds after the first and second slaps). Jane was unequivocal in her statement that as soon as she started crying, all contact ended and the men left within 20 seconds. John therefore left within one minute of the first slap. There is no substantial evidence supporting a conclusion that John failed to remove himself from the situation.

34

The Appeals Panel held that the way John removed himself from the situation was insufficient to comply with section 11.44C because he "was abandoning the complainant in a situation endangering her, and also because he was fleeing after the misconduct occurred." There is no evidence in the record to support these conclusions. As discussed more fully below, there is no evidence that Jane was in danger after John and the other men left; she told interviewers that she immediately went to the bathroom to collect herself and then returned to her friends. Moreover, the Appeals Panel's interpretation places John in a Catch-22: The language of 11.44C permitted John to remove himself from the situation to comply with its requirements, but the Appeals Panel held that he violated 11.44C by doing so.[15] Such a ruling cannot be sustained.

An "abuse of discretion is established if the court determines that the findings are not supported by substantial evidence in the light of the whole record." (Code Civ. Proc., § 1094.5, subd. (c).) Here, substantial evidence does not support the Appeals Panel's conclusion that John either encouraged or permitted Student 1 or Student 2 to slap Jane, or that John failed to remove himself from the situation. In light of the entire record, the Appeals Panel's finding that John violated section 11.44C is not supported by substantial evidence.

### 2. *Section 11.32*

USC argues in its cross-appeal that substantial evidence supports the Appeals Panel's conclusion that John violated Section 11.32, and therefore that violation should be reinstated.[16] Section 11.32 prohibits "[c]onducting oneself in a manner that endangers

---

[15] As discussed in the following section, USC furthers the nature of the Catch-22 by arguing that John also violated 11.32 by removing himself from the situation. Under this logic, by complying with the mandate of 11.44C, John necessarily violated 11.32.

[16] In its cross-appellant's reply brief, USC goes far beyond the scope of its opening brief and argues additional points relating to John's appeal. When a party is both an appellant and respondent, as is the case here, "[a] party must confine a reply brief, or the reply portion of a combined brief, to points raised in its appeal." (Cal. Rules of Court, rule 8.216(b)(3).) We therefore have not considered any arguments from the reply brief that extend beyond the scope of USC's opening brief relating to John's alleged violation

the health or safety of other members or visitors within the university community or at university sponsored or related events." According to USC, there is substantial evidence that "Petitioner endangered Jane's safety by abandoning her in the bedroom," or phrased another way, "abandoning a vulnerable student, exposed, on a bed, where other partygoers had full access, would support a violation of Section 11.32."

This argument is unpersuasive. USC's suggestion that John endangered Jane's safety simply because she was "in a rented house in Hollywood, far from the USC campus, and full of college students, many of whom had been drinking" is purely speculative. There is no evidence in the record that Jane's health and safety were in any danger after John left the bedroom. There is therefore no evidence that John violated section 11.32 by leaving Jane in the bedroom.

The Appeals Panel concluded that John violated 11.32, but it reached that decision by disregarding both Jane's and John's accounts of what occurred, and instead relying on the report of John's friend, Witness 6. Witness 6 reported that during the party, John said he left Jane in the bedroom with the other men. The six interviews of Jane and John made clear that this was not correct. Jane said in her first interview that after she cried, John, Student 1, and Student 2 stopped, quickly dressed, and left the room within 20 seconds. In her second interview, she said when she started crying, "they dressed and they all left." In her third interview, Jane said she was not sure if all the men left together, because she went into the bathroom, and nothing about John's departure was mentioned in the fourth interview. John told investigators in his first interview that when he left the bedroom he ensured Student 1 and Student 2 also left, and he said in his second interview that when he walked out, Student 1 and Student 2 were with him. John's friend C also told interviewers that he saw John, Student 1, and Student 2 emerge from the bedroom together.

Hearsay evidence that contradicts all firsthand accounts of what occurred is not substantial evidence sufficient to support a finding that John endangered Jane's health or

of section 11.32. (Cal. Rules of Court, rule 8.204(e)(2); *Hawran v. Hixson* (2012) 209 Cal.App.4th 256, 267-268.)

safety when he walked out of the bedroom.  Under the substantial evidence test, the quality of the evidence is important.  (*Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 651.)  "'Substantial evidence' is evidence of ponderable legal significance, evidence that is reasonable, credible and of solid value."  (*Ibid.*)  The hearsay recounted by Witness 6, which directly contradicts the accounts of percipient witnesses John (the alleged source of Witness 6's information), Jane, and C, does not meet this standard.  The Appeals Panel's finding that John violated section 11.32 was therefore not supported by substantial evidence.

Because John was denied a fair hearing as required by Code of Civil Procedure section 1094.5, and substantial evidence does not support the Appeals Panel's findings, John's petition for writ of mandate should have been granted.

## DISPOSITION

The judgment is affirmed to the extent that it sets aside USC's decision that John violated Student Conduct Code section 11.32.  The judgment is reversed in all other respects, and the matter is remanded to the trial court with directions to grant John's petition for writ of mandate.  John shall recover his costs on appeal.

## CERTIFIED FOR PUBLICATION


COLLINS, J.

We concur:


EPSTEIN, P. J.


WILLHITE, J.

37