Filed 6/12/25  Doe v. University of Southern Cal. CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| JANE DOE, | B333387 |
| Plaintiff and Appellant, | Los Angeles County |
| v. | Super. Ct. No. 22STCP03877 |
| UNIVERSITY OF SOUTHERN CALIFORNIA, | |
| Defendant and Respondent. | |

APPEAL from an order of the Superior Court of Los Angeles County.  Mitchell L. Beckloff, Judge.  Affirmed.

Hathaway Parker, Mark M. Hathaway and Jenna E. Parker for Plaintiff and Appellant.

Pazzani & Sandhu and Karen J. Pazzani for Defendant and Respondent.

———————————————

## SUMMARY

Plaintiff Jane Doe sought a writ of mandate directing the University of Southern California (USC or defendant) to set aside its administrative decision in February 2023 dismissing her as a student from the Keck School of Medicine (Keck) for failure to adhere to Keck's code of professional behavior.

The three matters precipitating plaintiff's dismissal began with a relatively minor incident in May 2021, followed by a series of communications in August and September 2021 for which plaintiff was placed on professional behavior probation, followed by an incident in September 2022 involving plaintiff's use of (and misrepresentations about) a printed copy of an identification badge to enter the county medical facility where she worked.

The trial court, in a thorough 25-page opinion, found the plaintiff had a fair hearing, defendant's administrative fact findings were supported by substantial evidence, and a reasonable decisionmaker could conclude that dismissal was an appropriate penalty for the multiple violations of Keck's code of professional behavior.

Plaintiff, whose academic and clinical performance has not been questioned, contends the trial court should have evaluated the evidence using its independent judgment, as required where an administrative decision affects a fundamental vested right. Plaintiff also contends the evidence does not support the defendant's findings; defendant did not provide a fair hearing; and the penalty imposed was an abuse of discretion.

We find no merit in plaintiff's contentions and affirm the trial court's order denying plaintiff's petition.

## FACTUAL BACKGROUND

### I.    The Parties and the Process

#### A.  Jane Doe

Plaintiff was a medical student at Keck in the class of 2023 when the decision to dismiss her was made on February 24, 2023. The trial court granted a stay of the dismissal decision on March 9, 2023, allowing plaintiff to complete her final semester of course work.

Plaintiff attended USC as an undergraduate from August 2010 to May 2014.  During that time, plaintiff was registered with USC's department in charge of disability accommodations, now known as the Office of Student Accessibility Services (OSAS), as having attention deficit hyperactivity disorder (ADHD) and type 1 diabetes.  Plaintiff again registered with OSAS while she was in medical school, in April 2020.

#### B.  Keck's Code of Professional Behavior

Keck students subscribe to a code of professional behavior "in order that our activities reflect the high standards of moral character demanded by the medical profession."  Among other things, students are required:

To conduct themselves "with the highest degree of integrity and honesty."

To "hold [themselves] accountable to local, state and national laws relevant to learning and healthcare environments and to the policies and procedures of the school and its associated clinical sites."

To "treat others with respect and honor their dignity."

To "respond to all emails, calls, and other communications from [Keck] in a timely and appropriate manner."

If a violation of the code occurs, "the Associate Dean for Student Affairs will be informed. Individuals who have had difficulty adhering to this policy may be referred to the Student Performance Committee. If violations persist, the student may be subject to probation, suspension or dismissal."

Keck also has a policy on dismissal of students. This policy likewise states that a student may be dismissed for violations of the code of professional behavior.

The student performance committee (the committee) is responsible for monitoring and evaluating student professional conduct, and makes decisions on matters including eligibility for graduation, professional behavior probation, and dismissal. The committee is composed of the chair and 12 voting faculty members. A committee decision may be appealed to the vice dean for medical education, who will issue a final decision in writing to the student.

## II.   The Disciplinary Events

There were three sets of events that eventually led to plaintiff's dismissal.

### A. July 19, 2021:  The committee finds plaintiff "at risk" for professionalism probation

On May 17, 2021, plaintiff undertook a full-length practice examination sponsored by "UWorld," in preparation for the United States Medical Licensing Examination Step 1 (part of a three-step examination program for medical licensure in the United States). According to plaintiff, the settings for the practice examination on her UWorld account did not reflect the correct timing accommodation for her medical conditions, which she had obtained through OSAS, and a UWorld representative told her the correct timing "could only be authorized by USC staff

4

Student Programs Advisor, Ms. Olivia Ann Roussell, and Associate Director of Academic Support Services, Nadia Sellami, Ph.D."

Plaintiff then sent the following e-mail to Ms. Roussell and Dr. Sellami, marked as "URGENT":

"Hello Olivia and Dr. Sellami, [¶] I just got off the phone with UWorld and learned that I need you to update my account to have it reflect the timing that I was approved for by NBME [National Board of Medical Examiners] (1.5x). I am unable to take my assessment today because my account is inaccurate. [¶] Additionally, I would like to request that in the future, Keck purchase step 1 UWorld subscriptions that do not give the institution authority over all student accounts, and instead allow each student to be their own account administrator. It is disruptive to have to correspond with UWorld to make changes to timed modes, only to learn that we don't have any authority over our accounts because of the arrangements Keck made with their group subscriptions. [¶] Please let me know when my account is updated. I have been on the phone and email with UWorld since 9am when I was trying to take this exam and simulate a real test day. [¶] All the best, [¶] Jane Doe"

The next day, May 18, 2021, Dr. Ranna Nash (director of academic support programs) responded to plaintiff's e-mail, explaining that her demand was inappropriate and it was UWorld, not the school, that was responsible for updating her account. Dr. Nash provided the name of a business contact at UWorld for plaintiff to work with on any future issues. Dr. Nash stated that the practice test bank "was given [as] a gift from a donor to support your class and this is usually not a resource that is paid by the school for students. The responsibility is usually

5

on the students to provide the resource for themselves." In addition, Dr. Nash stated: "Again – I understand the stress that you have while [] studying for Step 1 and we are here to support you – but would appreciate a more respectful email in the future."

Dr. Raquel Arias (then the interim associate dean for student affairs) tried to set up a Zoom meeting with plaintiff to discuss the e-mails on May 19, 2021, but plaintiff responded that she was unavailable by phone or Zoom and only available by e-mail. (Plaintiff also had an "auto-reply" on her e-mail account saying she was out studying and would not be responding.) Plaintiff and Dr. Arias eventually met on June 1, 2021; plaintiff told Dr. Arias she agreed she should have replied to Dr. Arias sooner. Dr. Arias told her that students were not permitted to communicate with faculty solely by e-mail. Plaintiff was informed she should appear at the student performance committee's June meeting. This was postponed at plaintiff's request because of plaintiff's vacation plans.

On July 9, 2021, the chair of the committee notified plaintiff the committee "would like to meet with you to discuss your professionalism related to communication" at its meeting on July 14, 2021. Plaintiff told Dr. Arias she had never received "the documentation of my violation," and Dr. Arias told her the subject was conduct "related to your interactions with faculty and staff who are here to help you, including the KLASS [Keck Learning and Academic Support Services] team," and the committee would also "want to hear about your 'out of the office email' that was associated with a delay in your response to the Student Affairs office."

6

On July 12, 2021, plaintiff prepared a statement for the committee describing her view of the issues and apologizing for "the tone of my emails."

After the July 14 meeting, the committee notified plaintiff that she would be "placed on 'at risk' for professionalism probation," and that her professional behavior would continue to be monitored. The committee also assigned a faculty mentor to plaintiff "to strengthen [her] professional development."

## B. February 11, 2022: The committee places plaintiff on professional behavior probation

In August and September 2021, after she was placed "at risk" of professional probation, plaintiff had a series of communications with Keck staff about disability accommodations for her clinical rotation in obstetrics and gynecology (also referred to as the Ob/Gyn clerkship).

As described above, OSAS is responsible for approving disability accommodations, and plaintiff was approved for and received examination accommodations, in the form of extra time to complete timed exams. Plaintiff determined in May 2021 that she needed other accommodations for her clinical rotations, including access to food, unscheduled breaks, and scheduling accommodations. Plaintiff received an email on June 28, 2021, about sites for upcoming clinical rotations, which would be assigned by lottery. Plaintiff contacted OSAS on July 16, stating that she had "a handful of new accommodations I need now that I am working in the clinical setting." Plaintiff received another email on August 10, 2021 about an upcoming site lottery for clinical rotations.

On August 24, 2021, plaintiff stated in an email to Keck administrative staff that she was working with Dr. Nash to

7

identify the accommodations she needed and had not yet been able "to update my [OSAS] accommodations precisely, but [OSAS] recommended I reach out to whoever makes our schedules within Keck to try to work this out informally." She also inquired about her clinical site preference. She was told that Dr. Stephanie Zia was in charge of requests for site assignments outside the lottery process.

The next day, Dr. Zia told plaintiff that site assignments had already been made, and that "[a]s you continue to work with OSAS . . . , if any accommodations get finalized and you have a letter to provide, our team and Dr. R. Nash, our [Keck] liaison, will help guide you through next steps."

On August 26, 2021, plaintiff e-mailed Dr. Zia "to ask if I can get my OSAS letter over to you this week if you can make adjustments pending this?" Her e-mail further stated that "the OSAS guidance I was given was to work with [Keck] informally on the process of site selections, as my needs really vary based on the rotation." Dr. Zia again directed plaintiff to work with OSAS and Dr. Nash, and copied Kim Nyugen, a specialist at OSAS, on this email.

Plaintiff was assigned to an Ob/Gyn rotation at LAC+USC on or before August 26, 2021.

On September 1, 2021, Kim Nguyen of the OSAS office e-mailed plaintiff, trying to schedule a meeting "to further discuss your accommodation requests for your rotations." Ms. Nguyen also stated, "While we are reviewing your additional accommodation request for your rotations, we are requesting updated documentation from a treating provider regarding your disability and functional limitations." She directed plaintiff to the OSAS website for guidelines and verification forms, and

asked plaintiff to have her provider complete a verification form and send it to Ms. Nguyen.

Plaintiff did not respond to the September 1 email from Kim Nguyen. Instead, three weeks later, on September 20, 2021, plaintiff e-mailed the LAC+USC Ob/Gyn department directly to inquire about a schedule based on her medical needs, stating that OSAS "recommended I reach out to the team responsible for creating student schedules and work with them to form a schedule that meets my health needs."

This request precipitated an e-mail on September 20, 2021 from Dr. Kevin Phung at the LAC+USC Ob/Gyn department to the Keck student affairs office, asking for more details about accommodations that plaintiff "has reportedly been approved for through the disability office" and stating that the "last minute nature of the request may cause quite a disruption to the other students' schedules."

Ms. Nguyen emailed plaintiff again on September 20, stating in part: "In your correspondence [to the Ob/Gyn department at LAC+USC], you mentioned that [OSAS] recommended that you reach out to the team responsible for coordinating student schedules in order to meet your health needs. That is not typically guidance that our office provides to students. If a student is requesting disability-related accommodations for their rotations, they work directly with their OSAS Specialist to further discuss the request and provide documentation supporting the request." Ms. Nguyen also stated: "I sent you an email on 9/1/21 to set up a meeting with you to discuss your accommodation requests for rotations, but I have not heard back from you." Ms. Nguyen again proposed meeting times

9

"if you are still requesting accommodations for rotations at this time."

Ms. Nguyen and plaintiff met on September 22, 2021, and Ms. Nguyen explained that she would follow up with the Keck scheduling team and provide plaintiff with updates during the review process. According to plaintiff, Ms. Nguyen told her on October 1, 2021 that her schedule accommodations were approved by OSAS, but this approval is not documented in the record.

On September 29, 2021, the student performance committee notified plaintiff that it would like to meet with her "to discuss your communication related to site preferences for the Obstetrics and Gynecology clerkship" at its October 13, 2021 meeting.

Two days before the meeting, plaintiff submitted a two-page statement responding "to the committee's concern that I broke protocol by asking clinical faculty for disability accommodations and not going directly through Student Affairs."

On October 14, 2021, the committee wrote to plaintiff, stating: "After talking with you about your lack of following protocol for requesting accommodations and due deliberation, the Committee decided to place you on Professional Behavior Probation."

Plaintiff appealed the committee's decision to Dr. Donna Elliott, the vice dean for medical education. The basis for the appeal was that the probation decision was grossly disproportionate to the violation found. Plaintiff's appeal discussed the relevant communications about the accommodations at length, and also described the events that had resulted in plaintiff's being placed at risk of probation.

10

Dr. Elliott granted the appeal in part, directing the committee to reconsider its decision.  Dr. Elliott agreed with plaintiff that the probation decision, if based only on the failure to follow protocol for requesting accommodations, would be grossly disproportionate to the violation found.  However, Dr. Elliott noted "potential discrepancies in the information you shared with [Keck] faculty."

Dr. Elliott identified the discrepancies in detail, and stated that "[b]ased on this, I am concerned that the information you shared by email with [Keck officials] was not accurate." Dr. Elliott referred the matter back to the committee "to reconsider whether you have adhered to the [Keck] Code of Professional Behavior in your communications with [Keck] officials."  Dr. Elliott stated plaintiff was expected to appear at the committee's next meeting and to "address the foregoing information."

The committee met with plaintiff on January 14, 2022. Plaintiff submitted a written statement for this meeting dated January 7, 2022, which asserts that she had spoken with a previous OSAS specialist, Morgan Baker, in December 2020 and was told that "OSAS would support testing accommodations, and clinical scheduling . . . would be appropriately handled directly with the departments, as OSAS involvement was not required for accommodations of this nature," and that her communications with Keck and LAC+USC regarding scheduling accommodations in August-September 2021 were based on her "understanding of Ms. Baker's recommendations."[1]  This statement was distributed

_____

[1]      This reference to a conversation with Morgan Baker does not appear in plaintiff's prior statement submitted to the

11

to all members, and the committee tabled its decision "pending further deliberation and investigation."  On February 11, 2022, the committee decided to place plaintiff on professional behavior probation for her violation of the code of professional behavior, "specifically pertaining to Honesty and Integrity."

The committee explained the factual basis for its decision in detail.  The committee referred first to plaintiff's e-mails of August 24, 2021 and September 20, 2021.  In the August 24 e-mail, plaintiff stated to Student Affairs personnel that OSAS *"recommended* I reach out to whoever makes schedules within Keck to try to work this out informally."  In the second e-mail, plaintiff stated to the Ob/Gyn department, including the clerkship director, Dr. Phung, that "*USC's disability office recommended* I reach out to the team responsible for creating student schedules and work with them to form a schedule that meets my health needs."  (Italics added.)

The committee stated:  "These emails misrepresent that accommodations were already established with the [OSAS], or implied that OSAS had directed you to reach out to Student Affairs or the Ob/Gyn clerkship."  However, OSAS records showed that plaintiff was never approved for any accommodations for her clinical rotations, and Ms. Nguyen received no response to her September 1, 2021 e-mail trying to set up a meeting with plaintiff to discuss clinical accommodations for rotations.  Further, Ms. Nguyen's September 1 e-mail "was after your e-mail to Assistant Dean Zia on August 26, 2021, asking 'if I could get my OSAS letter over to you this week if you

---

committee on October 11, 2021, or in her October 27 statement appealing the committee's decision.

can make adjustments pending this,' which implied you already had accommodations from OSAS."

The committee also reviewed plaintiff's January 7, 2022 letter submitted to the committee and addressed her statements about a December 2020 conversation with Morgan Baker. Morgan Baker was no longer with OSAS, and as mentioned, Ms. Nguyen became plaintiff's specialist. According to Ms. Nguyen, Ms. Baker's notes did not reflect any counseling that plaintiff should work directly with individual departments to manage her scheduling accommodations.

Plaintiff's January 7, 2022 letter also stated that on September 23, 2021, she spoke to Dr. Nash, who "approved of my communications to the Obgyn department beginning on September 20, 2021," and "encouraged me to continue communicating with the Obgyn department and to work out the days/nights logistics with Obgyn." Dr. Nash, however, described the September 23 meeting differently; Dr. Nash reminded plaintiff that "if you are requesting accommodations then your current accommodations memo [for examination times only] needed to be updated, and then Student Affairs would be able to revisit the issues of preferences for Ob/Gyn if you were asking for accommodations for disability reasons."

The committee concluded: "When questioned by the Committee about what occurred, you remarked that it was a case of miscommunication and that you did not intend to circumvent the process. However, after reviewing all the emails and reaching out to the other departments involved, the Committee believes that you were attempting to make autonomous scheduling decisions and intimating to the clerkship and Student Affairs that you already had accommodations from OSAS for your

13

clinical rotations.  This lack of professional behavior shows a lack of insight into the seriousness of the situation and the importance that the Keck School places on professionalism."

The committee cautioned plaintiff that "any additional evidence of a lack of professional behavior on your part may result in the [committee] convening to consider you for dismissal from the Keck School of Medicine."

Plaintiff appealed the committee's probation decision to Dr. Elliott, who denied the appeal on March 25, 2022.

### C.  March 1, 2023:  the committee dismisses plaintiff from Keck, effective as of February 24, 2023

On September 22, 2022, during the last week of plaintiff's psychiatric emergency rotation at LAC+USC, she misplaced her medical student LAC+USC identification badge.  Los Angeles County's Department of Health Services has a policy on identification badges, applicable at LAC+USC, requiring personnel issued identification badges "to wear them in a prominently displayed position at all times while on County premises."  The badges are reissued biennially "and color coded for easy identification"; a lost or stolen identification badge must be reported to law enforcement within five business days, an affidavit must be signed, and so on.

Plaintiff decided it would be "an appropriate temporary measure" to print out her previous badge, using a picture of that badge stored on her phone, to gain access to and move throughout the LAC+USC facility.  This worked for her on September 22, 2022, but in the afternoon of the second day she used it (Sept. 23), security personnel at the inpatient tower told her she was not allowed to use a paper printout of her badge.  She followed instructions to throw it away and sign in at the Visitor Desk,

14

where her identity was verified and she was given a temporary employee badge for the day. When she went home that evening, she located her LAC+USC badge on her coffee table.

This incident once again brought plaintiff before the student performance committee. On September 23, 2022, plaintiff received an email requesting that she meet with student affairs regarding the badge incident. Plaintiff replied by email that there was a "misunderstanding" regarding her badge and she "went immediately to HR" to resolve the situation. She sent a somewhat different email to her faculty mentor, saying that she forgot her badge, "was approached by security and I promptly followed their instructions, but they escalated the issue to HR." She sent another email to student affairs on September 27, stating that "I shared with Roland that I forgot my badge and could he please print me a copy to go to my rotation. This led to my confusion when security stopped me the next day and indicated I could not have a printed copy. I then told them that my school helped print the copy, so I was confused." On October 4, 2022, the committee notified plaintiff that it wanted to meet with her at its October 12, 2022 meeting "to discuss your use of a fraudulent badge at the LAC-USC Medical Center."

On October 10, 2022, plaintiff submitted a three-page statement explaining her conduct. Among other things, she stated that she had been at the Keck student affairs office when she realized she did not have her LAC+USC badge. She had an image on her phone of her "previous blue badge, but not the new green version," so she "asked Roland Rapanot, Program Manager and Student Services Advisor, if he would be able to print a copy of my badge from my phone image so I could go to work," and "he printed it for me in the Student Affairs Office."

15

As mentioned, plaintiff got through security a number of times, until the afternoon of the second day, when security confiscated the paper badge. In her statement to the committee, she again stated that when the security guard stopped her, she "expressed that I was confused, as my school helped me to print the paper badge for temporary use."

On October 19, 2022, after meeting with plaintiff on October 12 and considering her written statement, the committee notified plaintiff that it had decided to consider her for dismissal from Keck at its next meeting on November 9, 2022, "for your continued lack of professional behavior; most recently, your violations of the Code of Professional Behavior, including but not limited to '[w]e will conduct ourselves with the highest degree of integrity and honesty' and '[w]e hold ourselves accountable . . . to the policies and procedures of the school and its associated clinical sites.'"

The meeting on plaintiff's dismissal, initially scheduled for November 9, 2022, was ultimately held on February 24, 2023.

In the interim, on October 26, 2022, plaintiff filed a petition for writ of mandate to set aside the decision to place her on probation.

On November 1, 2022, plaintiff asked for a copy of the "records and information used in arriving at the decision to recommend [her] for consideration for dismissal." The associate dean for student affairs, Dr. Tanisha Price-Johnson, responded that the school was working with its legal team to collect the items plaintiff requested.

On November 2, 2022, plaintiff suggested postponement of the meeting scheduled for November 9 until the documents were

provided and plaintiff had a reasonable time to prepare a response.

On November 4, 2022, Dr. Price-Johnson told plaintiff the school had decided to reschedule the November 9 committee meeting and would notify her of the new date. The dismissal hearing was scheduled for February 24, 2023.

On February 10, 2023, plaintiff requested "all evidence" used by the committee in deciding to recommend her for dismissal.

On February 14, 2023, defendant provided plaintiff with two policy statements containing the county's policies on identification badges, Keck's code of professional behavior, and a "timeline" for the badge incident.

The timeline included Roland Rapanot's recollection of the interaction with plaintiff during which plaintiff said she asked him if he would print the badge "so I could go to work," and about which she told security that "my school helped me to print the paper badge for temporary use." Mr. Rapanot stated he had been printing something for someone else, and plaintiff overheard him saying that he could print it in color; plaintiff then asked him "if I can also print something for her in color and I said yes. She just said 'I need a color print out of my ID' and she emailed it to me."

On February 21, 2023, after meeting with plaintiff to discuss the upcoming committee meeting, Dr. Price-Johnson sent plaintiff copies of documents the committee would consider, including those related to the events leading to plaintiff's being placed at-risk and then on probation.

On February 22, 2023, plaintiff submitted her written statement for the dismissal hearing.

On February 23, 2023, plaintiff asked for "the 84-page document distributed to the [committee] today." Dr. Price-Johnson responded that the committee received the same documents already in plaintiff's possession. Plaintiff asked again the next morning, and the documents were e-mailed to her 40 minutes later.

On the afternoon of February 24, 2023, the committee conducted the dismissal hearing. As plaintiff had been previously told, the committee first met without plaintiff present to consider what questions they had, and then invited plaintiff into the hearing to respond to questions and make any statement she wished to make. There is no transcript in the record, and there were no witnesses at the hearing other than plaintiff.

The committee documented the proceedings in a four-page letter from the chair, Dr. Matthew Johnson, dated March 1, 2023, determining that plaintiff should be dismissed from Keck effective February 24, 2023. (According to plaintiff, Dr. Johnson called her to inform her of the decision shortly after the meeting ended.)

The dismissal letter discusses the committee's rationale at some length, describing plaintiff's "repeated pattern of unprofessional behavior," beginning with her unprofessional communications in May 2021 that put her at risk of probation; continuing with her lapse in professionalism a few months later when she misrepresented the state of her disability accommodations, resulting in her probation; and culminating in the September 2022 badge incident. As the trial court observed, the committee's dismissal decision "relied, in substantial part, on [plaintiff's] written statements to [the committee] as well as her oral response to questioning at the dismissal hearing."

In addition to recounting in detail the misrepresentations plaintiff made in connection with accommodations for her Ob/Gyn clinical rotation, the committee stated about the badge incident: "When the Committee asked you about your statement to security that your 'school helped [you] print the badge for temporary use,' you responded that you did [not] see how the statement was dishonest." Similarly, in her written presentation to the committee, plaintiff stated that when she was stopped by security, "I expressed that I was confused, as my school helped me to print the paper badge for temporary use. I did not say that Keck permitted me to use the paper badge. Rather, I said that they had printed it for me at my request." The committee observed that "by reporting to County employees that the Keck School printed a paper copy of your badge 'for temporary use,' you implied that Keck granted you permission to use it, which they did not."

The committee further observed that, when plaintiff pointed out that some security guards allowed her to use the paper badge, plaintiff was "attempting to shift the blame for [her] own decisions onto security," showing "a lack of insight into the importance of conducting [herself] with integrity and honesty."

Plaintiff appealed the dismissal decision to Dr. Elliott. Dr. Elliott denied the appeal, concluding: "Your demonstrated pattern of dishonesty and failure to take accountability is troubling for a would-be doctor. When doctors are dishonest and fail to take accountability, patients can suffer adverse consequences. A career in medicine thus requires the highest degree of professionalism and integrity and you have not met [Keck's] standards in this regard."

Plaintiff then appealed the decision to the dean of the medical school, Dr. Carolyn C. Meltzer. Dr. Meltzer denied the appeal. Dr. Meltzer agreed with the assessments by the committee and Dr. Elliott that plaintiff's communications about her Ob/Gyn clerkship and her communications about her use of a paper badge "demonstrate that you have not conducted yourself with integrity and honesty." Dr. Meltzer further concluded that plaintiff's use of the paper badge and subsequent misrepresentations to security "standing alone would have been sufficient grounds to dismiss you from [Keck]." Taking into account both sets of misrepresentations, the committee "had more than sufficient grounds to dismiss you. Your pattern of behavior demonstrates that you have a propensity to make misrepresentations, particularly when confronted with mistakes. This type of behavior is unacceptable for a physician and unacceptable for a [Keck] student. Thus, I do not believe that you have earned the privilege of graduating from [Keck] and holding yourself out as an alumnus. I do not make this decision lightly; however, it is my professional judgment that you have not met the professionalism standards necessary to enter the medical field or to be a [Keck] graduate."

On June 22, 2023, plaintiff filed an amended petition for writ of mandate to set aside the decisions placing her on probation and dismissing her from medical school.

As stated at the outset, the trial court denied plaintiff's petition, concluding plaintiff received a fair hearing, defendant's findings were supported by substantial evidence, and a reasonable decisionmaker could conclude that dismissal was the appropriate penalty.

20

## DISCUSSION

## I.    The Standard of Review

"The scope of our review from a judgment on a petition for writ of mandate is the same as that of the trial court.  [Citation.] 'An appellate court in a case not involving a fundamental vested right reviews the agency's decision, rather than the trial court's decision, applying the same standard of review applicable in the trial court.' " (*Doe v. University of Southern California* (2016) 246 Cal.App.4th 221, 239 (*Doe*).)  We determine whether the defendant " 'has proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion.' " (*Ibid.*, quoting Code Civ. Proc., § 1094.5, subd. (b).)  An abuse of discretion is established if the defendant " 'has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence.' " (*Ibid.*)  Where it is claimed that the findings are not supported by the evidence, "abuse of discretion is established if the court determines that the findings are not supported by substantial evidence in the light of the whole record."  (§ 1094.5, subd. (c).)

We review the fairness of the administrative proceeding de novo.  (*Doe, supra,* 246 Cal.App.4th at p. 239.)  "Where student discipline is at issue, the university must comply with its own policies and procedures."  (*Ibid.*)

## II.    Contentions and Conclusions

### A. The trial court used the correct standard of review

Plaintiff's first contention is that we should return this case to the trial court to exercise its independent judgment, because the defendant's decision affected plaintiff's "vested fundamental

21

rights." Plaintiff cites *Bixby v. Pierno* (1971) 4 Cal.3d 130 (*Bixby*), where the court stated that courts "must decide on a case-by-case basis whether an administrative decision or class of decisions substantially affects fundamental vested rights and thus requires independent judgment review." (*Id.* at p. 144.) Plaintiff quotes the court's further statement that, "[i]n determining whether the right is fundamental the courts do not alone weigh the economic aspect of it, but the effect of it in human terms and the importance of it to the individual in the life situation." (*Ibid.*) Plaintiff tells us the dismissal decision had a substantial economic impact, in terms of tuition and costs, forgone income, and student loans, and that "[i]n human terms," the dismissal decision prevents her "from obtaining the USC medical degree she paid for and earned, and which she is academically and clinically qualified to receive."

Plaintiff cites no authority that supports the proposition that she has a vested right to a medical degree from a private university, and the pertinent authorities are to the contrary. (See, e.g., *Doe v. University of Southern California* (2018) 29 Cal.App.5th 1212, 1231 ["A university disciplinary proceeding concerning sexual misconduct does not involve a fundamental vested right," citing cases].) Indeed, plaintiff would not even be academically qualified for the degree if the trial court had not granted her ex parte request to stay the dismissal decision on March 9, 2023, to permit her to complete her course of study and clinical rotations. (The stay specified that it did not require defendant to issue a medical degree, deem plaintiff to have graduated, or allow her to represent she has graduated "when she has not.")

The *Bixby* case clarifies that courts are to consider "the nature of the right of the individual: whether it is a fundamental and basic one, which will suffer substantial interference by the action of the administrative agency, and, if it is such a fundamental right, *whether it is possessed by, and vested in, the individual or merely sought by him. In the latter case, since the administrative agency must engage in the delicate task of determining whether the individual qualifies for the sought right, the courts have deferred to the administrative expertise of the agency.*" (*Bixby, supra,* 4 Cal.3d at p. 144, italics added.)

*Bixby* elaborates: "[I]n determining whether the right is sufficiently basic and fundamental to justify independent judgment review, the courts have considered the degree to which that right is 'vested,' that is, already possessed by the individual. [Citation.] . . . Courts are relatively ill-equipped to determine whether an individual would be qualified, for example, to practice a particular profession or trade. [Citation.] In a case involving the agency's initial determination whether an individual qualifies to enter a profession or trade the courts uphold the agency decision unless it lacks substantial evidentiary support or infringes upon the applicant's statutory or constitutional rights." (*Bixby, supra,* 4 Cal.3d at p. 146, fns. omitted.)

Here, a committee of nine faculty members concluded that plaintiff did not meet Keck's standards of professionalism, and that decision was reviewed and confirmed at two levels by two other medical professionals, first by the vice dean for medical education and then by the dean of the medical school. We necessarily defer to that decision if it is supported by substantial evidence and if plaintiff had a fair hearing.

## B. Defendant's findings are supported by the evidence

Plaintiff asserts that the disciplinary actions taken by the committee, leading up to and including her dismissal, were not supported by substantial evidence. We disagree, and will address plaintiff's arguments regarding each of the committee's three actions.

First, plaintiff asserts that she had no notice, before the March 1, 2023 dismissal letter, that her May 2021 e-mail communications "could have been considered to be in violation of any [Keck] code or policy." Plaintiff says it is not clear which communications she failed to respond to appropriately, or whom she failed to treat with respect.

Plaintiff's own statements in the record belie this contention. In her July 12, 2021 statement to the committee, she confirmed she was "responding to my interactions involving the Office of Student Affairs and the KLASS Team on May 17, 2021, as well as subsequent follow-up with Dr. Arias." Further, plaintiff "apologize[d] for my email communications throughout this time," acknowledging that her "communications came across as brusque," and she was "deeply sorry for the tone of my emails." And, "I regret that my response time and my availability was substandard during this time, and that I set an out of office email, which I later learned is prohibited by Keck." In addition, as Dr. Elliott pointed out, plaintiff's October 27, 2021 appeal to Dr. Elliott likewise "demonstrates that [plaintiff] understood the reasons [she was] placed at-risk for professionalism probation." Moreover, the committee did not place plaintiff on probation after its July 14, 2021 meeting with her, merely deeming her " 'at risk'

for professionalism probation" and appointing a faculty mentor to strengthen her professional development.

Plaintiff's May 17, 2021 email might not, if considered in isolation, indicate a lack of professionalism. But Dr. Nash's May 18, 2021 response provides context that explains the inappropriateness of sending an "URGENT" email to two Keck administrators, demanding that Keck purchase individual student accounts for the practice test bank, so that plaintiff could more easily adjust the timing settings for her practice tests.[2] The committee's decision to place plaintiff "at risk" of professionalism probation was supported by the evidence and not an abuse of discretion, as was Keck's later finding that this email was part of an overall pattern of unprofessional behavior.

Second, plaintiff contends the committee's findings in connection with her communications about scheduling accommodations for her Ob/Gyn clerkship – namely, that she violated the integrity and honesty tenet of Keck's code of professional behavior – were "not supported by evidence." The evidence recounted at pages 7 through 13 is substantial evidence that plaintiff's communications about accommodations for her Ob/Gyn clerkship were dishonest.

Plaintiff's assertions that "[a]ll students have a right to make scheduling requests," and that it was not contrary to Keck policy to attempt to work out scheduling accommodations informally, miss the point. The problem was dishonesty, not breach of protocol, as Dr. Elliot recognized in granting plaintiff's appeal from being placed on probation for not following protocol regarding scheduling, and directing the committee to focus

---

[2]     The record indicates that plaintiff later solved this problem by purchasing her own account for $40.

instead on "discrepancies" in the information plaintiff shared with Keck faculty.

Plaintiff misleadingly intimated that OSAS had already granted scheduling accommodations and that OSAS had recommended or guided her to reach out directly to faculty or staff responsible for clinical rotation assignments and schedules to request accommodations.[3] Defendant's findings regarding plaintiff's failure to conduct herself "with the highest degree of integrity and honesty" are supported by the evidence.

Third, plaintiff similarly contends that the finding she violated the integrity and honesty tenet during the misplaced badge incident must be set aside, because she "followed the Badge Policies" and "took reasonable, temporary measures to show a true and correct paper copy of her medical student badge," and did not violate the policy that requires individuals to report a lost or stolen identification badge within five business days. Plaintiff's argument again misses the point. The problem, again, was dishonesty. Instead of simply telling security personnel that she had misplaced her badge, providing identification, and signing in, as was apparently standard procedure, plaintiff misleadingly told security that "my school helped me to print the paper badge for temporary use." Her own written statements to the committee show an inability to recognize the dishonesty of

---

[3]     Even assuming that plaintiff was truthful in asserting that former OSAS specialist Morgan Baker recommended in December 2020 that she contact faculty or staff regarding scheduling accommodations, by the time of her September 20, 2021 emails to faculty and staff she had received clear guidance to the contrary from the current OSAS specialist Kim Nguyen and from Dr. Zia.

her conduct; she continued to insist that what she told security was "objectively true," and she never told security that Keck told her to use the printed copy of the badge to access LAC+USC Hospital, and she "never said Keck endorsed her usage of the paper badge."

These asserted justifications, far from being persuasive, provided further evidence of the pattern of behavior Keck was concerned about. The committee's March 1, 2023 letter to plaintiff clearly explains the basis for its decision: "As you know, Keck did not print a copy of your badge to allow you to use it to enter the LAC+USC Medical Center. [¶] . . . [¶] Your responses to the Committee . . . demonstrated that your response to being confronted with mistakes is to make misrepresentations and shift blame onto others." Substantial evidence supports defendant's decision to dismiss plaintiff for failure to adhere to the Keck code of professional conduct regarding honesty and integrity.

## C. Defendant provided a fair hearing

Plaintiff also briefly argues that Keck did not provide a fair hearing. She contends that Keck "subverted [plaintiff's] efforts to defend herself at every turn"; she was expected to "guess what would be adjudicated" at the dismissal hearing; and "did not receive the entire 84 pages of documents that was supplied to the [committee] until 12:00 p.m." on the day of the hearing.

As the trial court pointed out when plaintiff made this argument below, plaintiff "does not identify a single document within the 84 pages that had not previously been provided to her, or that she did not write." Nor does plaintiff show how her defense was "subverted."

27

The trial court considered in detail plaintiff's claims regarding procedural fairness, and concluded that she had adequate notice of the allegations, access to evidence and opportunity to respond, even though Keck does not provide transcripts of committee meetings or live hearings with an opportunity to confront and cross-examine witnesses. We agree that Keck provided plaintiff with a fair procedure, consistent with the principles outlined in *Boermeester v. Carry* (2023) 15 Cal.5th 72, 79 [private universities are required to provide fair disciplinary procedures, including notice and a meaningful opportunity to be heard, but are not required to provide live hearings].

### D. The sanction was not an abuse of discretion

In reviewing the severity of the discipline imposed, "[w]e review the actions of the [agency] to determine whether the discipline imposed constituted a manifest abuse of discretion." (*Landau v. Superior Court* (1998) 81 Cal.App.4th 191, 217.) An appellate court is not free " 'to substitute its discretion for that of the administrative agency concerning the degree of punishment imposed.' " (*Id.* at p. 218, italics omitted.) " 'If reasonable minds may differ with regard to the appropriate disciplinary action, there is no abuse of discretion.' " (*County of Los Angeles v. Civil Service Com.* (1995) 39 Cal.App.4th 620, 634.)

Plaintiff contends "[n]o reasonable mind" could consider the loss of her investment in her education and the loss of a professional career as a physician to be reasonable under the circumstances. She states there is "no substantial evidence that [she] lacks integrity or honesty"; the dismissal decision was "based on 'suspicion, conjecture and hearsay, and not on substantial evidence"; and was "grossly excessive."

28

While dismissal of a third-year medical student for reasons unrelated to academic or clinical performance is a severe penalty, and reasonable minds could differ as to whether it was warranted by plaintiff's conduct, our role is not to second-guess Keck's decision. Our role is limited to determining whether the decision was supported by substantial evidence, and was not an abuse of discretion. The penalty was imposed by a committee of nine medical professionals, who were "concern[ed] about [plaintiff's] pattern of behavior that violates the professional norms and expectations of the School, [plaintiff's] inability to acknowledge how [her] professional behavior violations could impact [her] career in medicine, and [her] lack of accountability for [her] unprofessional behavior." As the committee explained, "a career in medicine is different than a career in any other field. It requires the highest degree of professionalism and integrity because when medical professionals do not comport themselves with professionalism and integrity and hold themselves accountable, patients could be put at risk."

We do not see an abuse of discretion in defendant's dismissal decision.

## DISPOSITION

The order is affirmed.  Defendant shall recover costs on appeal.


MATTHEWS, J.*

We Concur:


STRATTON, P. J.


VIRAMONTES, J.

---

\*      Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.